UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHERI SAVAGE, as Executrix of the Estate
of Cindy Sieden,

                                    Plaintiff,

                - against -

RABOBANK MEDICAL PLAN,

                                    Defendant.

**MEMORANDUM
OPINION & ORDER**

19 Civ. 9893 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Sheri Savage – suing as executrix of the estate of her late sister Cindy

Sieden – brings this action against Defendant Rabobank Medical Plan, challenging the

termination of mental health benefits for Sieden's daughter, "J.S.," under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132.  (See Cmplt. (Dkt. No.

3) ¶¶ 1-2, 24-31)  The parties have cross-moved for summary judgment.  (Pltf. Mot. (Dkt. No.

29); Def. Mot. (Dkt. No. 26))

        For the reasons stated below, Defendant Rabobank's motion will be granted, and

Plaintiff Savage's motion will be denied.

# BACKGROUND

## I.    FACTS[1]

### A.    The Plan

Rabobank Nederland sponsors a "self-funded welfare benefit plan" for its

employees under the name Rabobank Medical Plan (the "Plan").[2]  (Pltf. R. 56.1 Resp. (Dkt. No.

39) ¶ 1; Def. R. 56.1 Resp. (Dkt. No. 43) ¶ 2)  UnitedHealthcare Service LLC serves as the

Plan's claims administrator (see Pltf. R. 56.1 Stmt., Ex. 12 (Dkt. No. 34-12) at 82, 95, 100)

(sealed),[3] and addresses claims for mental health benefits through its subsidiary, United

Behavioral Health ("UBH").  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 4)

The Plan grants UnitedHealthcare "the discretion and authority to decide whether

a treatment or supply is a Covered Health Service and how the Eligible Expenses will be

determined and otherwise covered under the Plan."  (Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11)

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 Statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted.") (citation omitted).  Where a
party opposing a motion disputes the movant's characterization of cited evidence, and has
presented an evidentiary basis for doing so, the Court relies on the adversary's characterization
of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw
all rational factual inferences in non-movant's favor in deciding summary judgment motion).
The same standards apply where, as here, cross-motions for summary judgment have been filed.
See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

[2]  The full name of the relevant welfare benefit plan is Rabobank Choice Plus 001 Plan, Group
Number 710773, effective January 1, 2017.  (See Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at
91; see Def. Br. (Dkt. No. 27) at 5)

[3]  Unless otherwise indicated, the page numbers of documents filed on the public docket
correspond to the page numbers designated by this District's Electronic Case Files ("ECF")
system.  For documents filed under seal, this Court refers to the page numbers used in the
Administrative Record ("AR").

at 105) (sealed)  UnitedHealthcare is authorized to "delegate [its] discretionary authority to other persons or entities that provide services in regard to the administration of the Plan."  (Id., Ex. 12 (Dkt. No. 34-12) at 78) (sealed)  As part of its responsibilities, UnitedHealthcare addresses "first" and "second level appeal[s]" of a denial of benefits under the Plan.  (Id. at 48-49) (sealed)

The Plan draws a distinction between "[c]overed" services – which the Plan will pay for – and "treatments [the beneficiary or her p]hysician may believe are necessary," but which the Plan "may not pay for" in their entirety.  (Id. at 76-77) (sealed)  UnitedHealthcare communicates "decisions about whether the Plan will cover or pay for the health care that you may receive," but it will "not decide what care you need or will receive.  You and your [p]hysician make those decisions."  (Id. at 76) (sealed)  The Plan advises members that "[i]f [it] does not pay, you will be responsible for the cost."  (Id. at 76-77) (sealed)

"Covered Health Services" is defined in the Plan as, inter alia, "those health services, including services, supplies[,] or [p]harmaceutical [p]roducts, which the Claims Administrator . . . determines to be"

> [p]rovided for the purpose of preventing, diagnosing[,] or treating Sickness, Injury, Mental Illness, Substance-Related[,] and Addictive Disorder Services or their symptoms [and]
>
> [c]onsistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines. . . .

(Id. at 83) (sealed)  "Scientific evidence" is defined as "the results of controlled Clinical Trials or other studies published in peer-reviewed, medical literature generally recognized by the relevant medical specialty community."  (Id.) (sealed)  "Prevailing medical standards and clinical guidelines" is defined as "nationally recognized professional standards of care including, but not limited to, national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines."  (Id.) (sealed)

The Plan also provides that

> [t]he Claims Administrator maintains clinical protocols that describe the scientific evidence, prevailing medical standards and clinical guidelines supporting its determinations regarding specific services.  You can access these clinical protocols (as revised from time to time) on **www.myuhc.com** or by calling the number on the back of your ID card.  This information is available to Physicians and other health care professions on **www.UnitedHealthcareOnline.com**.

(Id.) (emphasis in original) (sealed)

"Mental Health Services" are a "Covered Health Service[]" for the diagnosis and treatment of [m]ental [i]llnesses," which includes disorders such as anorexia nervosa, depression, and anxiety.  (Id. at 89) (sealed)  The Plan provides, however, that "[t]he fact that a condition is a [mental illness] does not mean that treatment for the condition is a Covered Health Service." (Id.) (sealed)  "Mental Health Services" include "the following levels of care":  "inpatient treatment"; "[r]esidential treatment"; "[p]artial [h]ospitalization/[d]ay [t]reatment"; [i]ntensive [o]utpatient [t]reatment"; and "[o]utpatient treatment."  (Id. at 19) (sealed)  Although the parties dispute the precise nature of each level of care, they agree that partial hospitalization/day treatment and outpatient treatment are lower levels of care than residential treatment.  (See, e.g., Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 37, 39-40) (describing partial hospitalization as a "lower level of care" than residential treatment)

To determine which services are covered and to "provide[] administrative services for all levels of care," the Plan delegates its discretionary authority to "[t]he Mental Health/Substance Use Disorder Administrator," which is defined as "the organization or individual designated by Rabobank who provides or arranges Mental Health . . . Services under the Plan."  (Pltf. R. 56.1 Stmt., Ex. 12 (Dkt. No. 34-12) at 19, 90) (sealed)  The Mental Health Administrator for purposes of the claims at issue here is UBH.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 4)

To assist with "medical necessity determinations" and "to standardize coverage determinations," UBH has adopted internal protocols, including "Level of Care Guidelines: Mental Health Conditions" (the "Guidelines"). (See Def. R. 56.1 Stmt., Ex. 5 (Dkt. No. 33-6) at 5, 7; see id. at 8 ("Peer Reviewers use the Level of Care Guidelines when . . . conducting a peer review, and as a basis for adverse medical necessity determinations."))[4] The Guidelines state that they are "derived from generally accepted standards of behavioral health practice" for determining the appropriate level of care, including "guidelines and consensus statements produced by professional specialty societies," "guidance from governmental sources," as well as "input provided by clinical personnel, providers, professional specialty societies, consumers, and regulators." (Id. at 5) Under the heading "Use and Limitations," the Guidelines state that they are to be "used flexibly," and are "intended to augment – but not replace – sound clinical judgment." (Id. at 8) Their application "is informed by the unique aspects of [each participant's] case." (Id.)

The Guidelines also include criteria for "admission" to, "continued service" at, and "discharge" from residential treatment and partial hospitalization. (Id. at 17-23)

The following general admission criteria apply to any level of care:

(1) "[t]he member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors";

(2) "[t]he member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care"; and

---

[4] The UBH Level of Care Guidelines are "updated annually to reflect . . . advances in evidence-based practice, regulatory requirements, and other opportunities to improve the quality of the [Guidelines]." (See Def. R. 56.1 Stmt., Ex. 5 (Dkt. No. 33-6) at 6) The Guidelines at issue here were revised in June 2016 for use between September 2016 and February 2017, which includes the relevant time period. (See id. at 2-23)

(3) "[t]here is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time." "Improvement" is "indicated by the reduction or control of the acute signs and symptoms that necessitated treatment in a level of care," and is "measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends." In addition, "[i]mprovement" must "be understood within the broader framework of the member's recovery, resiliency and wellbeing."

(Id. at 10-11)

The Guidelines describe a residential treatment center as a "sub-acute facility-based program which delivers 24-hour/7-day assessment" and "active behavioral health treatment." (Id. at 21) A member would qualify for treatment at a residential treatment center where her "[p]yschosocial and environmental problems . . . are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in [a residential] level of care." (Id.)

Partial hospitalization is described as a "structured program" that provides "assessment and diagnostic services," and "active behavioral health treatment" for "at least 20 hours per week." (Id. at 17) The "purpose" of such a program is "to stabilize and reduce acute signs and symptoms, increase functioning, and assist a member with integrating into community life." (Id.) To qualify for partial hospitalization, a member must meet one of the following criteria: (1) her "[a]ssessment and diagnosis" requires "observation and interaction" with the treatment team "for at least 20 hours per week"; (2) she requires "extended interaction" with the treatment team, for example, after treatment in an inpatient facility or in a residential treatment center; or (3) she "requires a structured environment" to practice skills in "face-to-face interactions several times a week that cannot be provided in a less intensive setting" or to "develop a plan for post-discharge services in a less intensive setting." (Id. at 17-18)

**B.**    <u>J.S.'s Claims for Mental Health Care</u>

In 2016 and 2017, Cindy Sieden was a participant in, and her daughter J.S. was a beneficiary of, the Plan.  (Def. R. 56.1 Resp. (Dkt. No. 43) ¶ 1; Pltf. R. 56.1 Stmt., Ex. 12 (Dkt. No. 34-12) at 91, 96 (sealed))[5]

J.S. has a history of mental illness, including anorexia nervosa, depression, and self-harming behaviors.  (Pltf. R. 56.1 Resp. (Dkt. No. 39) ¶ 7; Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 3-7 (sealed))  J.S. has attempted suicide several times.  (Def. R. 56.1 Resp. (Dkt. No. 43) ¶¶ 12-14)  At age eight she "took a knife" while "she was in the kitchen" and "cut her neck."  (Pltf. R. 56.1 Stmt, Ex. 10 (Dkt. No. 34-10) at 89) (sealed)  At age twelve she began cutting her arms and legs with knives, pencil sharpener blades, and razors; at age thirteen she attempted to "suffocate herself" with her pillow and to drown herself in the bathtub; and at age fourteen she took "random pills" in an attempt to kill herself.  (<u>Id.</u> at 89-90, 103) (sealed)

J.S. began therapy in February 2014 at age eleven.  (<u>Id.</u> at 100) (sealed)  She was treated at (1) Center for Discovery, a residential treatment program, between March and April 2015; and (2) ED-180, a part-time intensive outpatient program between September 2015 and May 2016.  (<u>Id.</u> (sealed); Def. R. 56.1 Stmt., Ex. 7 (Dkt. No. 36-1) at 2-3 (sealed); Def. R. 56.1 Resp. (Dkt. No. 43) ¶¶ 18-20)  Between May 2016 and September 2016, J.S. received outpatient services from her ED-180 treatment team, which included a pediatrician, a therapist, a nutritionist, and a psychiatrist.  (Pltf. R. 56.1 Stmt, Ex. 10 (Dkt. No. 34-10) at 100) (sealed) J.S.'s physical condition and mental health improved while she was receiving treatment, and by April 2015 she had reached her "goal" body weight.  (<u>See</u> <u>id.</u> at 100, 103) (sealed)

---

[5]  Sieden died on May 4, 2018, and her sister – Plaintiff Sheri Savage – brings this lawsuit on behalf of her estate.  (Cmplt. (Dkt. No. 3) ¶¶ 2, 19)

When J.S. began high school in August 2016, however, her condition deteriorated. (Def. R. 56.1 Resp. (Dkt. No. 43) ¶¶ 21-22) By September 2016, J.S. "was again restricting her food intake," "losing weight," "cutting her arm [and] wrists," "digging her nails into her arm," and engaging in other "attempts to harm herself." (Pltf. R. 56.1 Stmt., Ex. 10 (Dkt. No. 34-10) at 100) (sealed) Her outpatient treatment team concluded that J.S. was "failing to progress at a lower level of care," and they referred her to Avalon Hills Adolescent Treatment Facility ("Avalon"), a residential treatment center. (Id. at 103-04 (sealed); Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 25)

### 1.    Residential Treatment Between September 22, 2016 and December 4, 2016

J.S. was admitted to Avalon on September 22, 2016. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 25) J.S. was then fourteen years old. (Id.) She was 61.5 inches tall, and weighed 85 pounds, which is 81% of her ideal body weight. (Id. ¶ 26; Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 4-5 (sealed)) Her psychiatric intake assessment on September 29, 2016 – prepared by nurse practitioner Chad Speth with other members of Avalon's treatment team – reports that J.S. "used eating disorder and self-injury behaviors to manage distress and her anxiety." (Pltf. R. 56.1 Stmt., Ex. 10 (Dkt. No. 34-10) at 107-13) (sealed) J.S. was diagnosed with "Anorexia Nervosa, Restricting type, extreme," "Major Depressive Disorder (recurrent) severe," and generalized anxiety disorder. (Id. at 103-04, 113) (sealed) The Avalon treatment team concluded that,

> in light of [J.S.'s] failure to secure health and functioning in both inpatient and outpatient levels of care over time, it is clear that [J.S.] needs a residential stay geared towards uncovering and working through the etiological factors that lead to the eating disturbance. Due to the severe nature of her eating disorder, an attempt at this form of residential treatment incorporating exposure therapy, experiential activities, skills training, family therapy work, and more of a normalized eating set-up is clinically necessary.

(Id. at 112) (sealed)

At some point before September 22, 2016, J.S.'s mother filed a claim on J.S.'s behalf for residential treatment. (See Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 7) (sealed) United Behavioral Health approved coverage for J.S.'s residential treatment from September 22, 2016 to December 4, 2016. (Def. R. 56.1 Resp. (Dkt. No. 43) ¶ 31; Pltf. R. 56.1 Resp. (Dkt. No. 39) ¶ 8) After coverage was approved, UBH advised Avalon that a "clinical update will be required" for J.S. to continue to receive coverage at the residential level of care. (See Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 7) (sealed)

On December 4, 2016, UBH's Amirah Elhasan reviewed J.S.'s file to determine whether her residential treatment should continue to be authorized as a "Covered Health Service[]" under the Plan.[6] (Id. at 8-10) (sealed) Elhasan determined that J.S. no longer required residential treatment under the UBH Level of Care Guidelines. (Id. at 9) (sealed)

In reaching this determination, Elhasan noted that J.S. weighed 98.8 lbs, which is 94% of her ideal body weight; that she was responding "well to positive reinforcement"; and that she was compliant with her prescribed medication – Zyprexa 2.5 mgs. – which is used to treat psychiatric disorders. (Id.) (sealed) Elhasan also noted that Avalon had conducted a "family session" with Sieden to "discuss[] how to support [J.S. at] home." (Id.) (sealed) In conducting the review, Elhasan spoke with J.S.'s "utilization reviewer" at Avalon – Stephen Rosario – who reported that J.S. "continues to [refuse] food," and "need[s] staff support and redirection in order to complete [meals]." (Id.) (sealed) Rosario also stated that "it would be illogical to think that [J.S.] could complete[] meals if [discharged] to home, or to [a lower level of care,] such as [a partial hospitalization program]." (Id.) (sealed) Elhasan nonetheless concluded that J.S. had "no

---

[6] The record does not reveal Elhasan's position at UBH or his qualifications.

noted medical issues requiring intensive monitoring," and recommended that J.S. be discharged to a "lower level of care," such as a partial hospitalization program.  (Id.) (sealed)

On December 7, 2016, Lee Becker, M.D. – a UBH medical director and psychiatrist – conducted a "peer review" of J.S.'s file and agreed with Elhasan's conclusion.  (Id. at 11-12) ("[I]t is my determination that the requested [residential treatment does] not meet [Level of Care Guidelines] required to be [eligible for] . . . health plan benefits.") (sealed)  In making this determination, Dr. Becker spoke with members of J.S.'s Avalon treatment team – including therapist Mike Hines and nurse practitioner Chad Speth – who "indicated that the key reason for continued [residential treatment] is that [J.S.] has made gains but they feel that she will regress without continued 24-hour structure. . . . They feel she is [at] a high risk of relapse without continued 24-hour care. . . . They would like her to be less reliant on supplements and eating more solid foods."  (Id. at 12) (sealed)

However, Dr. Becker also considered the fact that J.S. had had "significant weight gain," was "not purging or binge purging," did "not have significant behavioral disturbances . . . such that she or others would be endangered without 24-hour care," and had significant family "support[]."  (Id.) (sealed)  Moreover, J.S.'s Avalon treatment team had confirmed that – if she were to transition to a lower level of care – her treatment team would "work with her family regarding rules[,] regulations[,] and monitoring at home."  (Id.) (sealed)  Based on his review, Dr. Becker concluded that J.S. "does not seem to have significant medical concerns needing 24-hour nursing care.  Her care could continue in the [partial hospitalization] setting."  (Id.) (sealed)

In a December 13, 2016 letter to Sieden, UBH states that it is denying J.S.'s claim for benefits for residential treatment at Avalon from December 5, 2016 forward.  (Id., Ex. 9 (Dkt. No. 36-3) at 3) (sealed)  The denial letter reads as follows:

12/13/2016 . . .

Health Plan/Group:  UnitedHealthcare Insurance Company, Inc.
Provider:  Nina Jorgensen, MD
Facility/Program:  Avalon Hills Adolescent Treatment Facility
Level of Care:  Residential
Service Type:  Mental Health Services
Date(s) of Service: 12/5/2016 forward

Dear Parent of [J.S.]:

United Behavioral Health (UBH) is responsible for making benefit coverage
determinations for mental health and substance abuse services that are provided to
UnitedHealthcare Insurance Company, Inc. members.  The availability of benefit
coverage for a service is determined by the terms of your benefit plan.  To review
information about your specific plan coverage, please refer to the benefit
information provided by your health plan.

I have reviewed the plan for your child's admission to Avalon Hills Adolescent
Treatment Facility.  Based on my review of the available documentation and all
information received to date, I have determined that coverage is not available
under your child's benefit plan for the following reason(s):

The decision is that benefits are unavailable for mental health residential
treatment for 12/5/2016 forward.  This is based on UBH Level of Care Guidelines
for Mental Health Residential Treatment Level of Care.  Your child was admitted
for treatment of eating disorder symptoms.  After talking with the providers, it
was noted she has made progress and her condition no longer meets Guidelines
for coverage of treatment in this setting.  She is doing better.  She has worked on
her recovery by generally following her meal plan.  Weight gain has occurred.
She is doing her daily tasks.  She has worked on her recovery by attending
programming and taking her medication.  She does not seem to have significant
medical concerns needing 24-hour nursing care.  She is not acting on every
feeling.  She is thinking clearly.  It appears treatment could continue in the mental
health partial hospitalization setting.

This determination does not mean that your child does not require additional
health care, or that your child needs to be discharged.  Decisions about
continuation of treatment should be made by you and your child's provider.  The
purpose of this letter is to inform you that, based on my review of the available

information, I have determined that coverage is not available under your benefit plan for your child's admission to Avalon Hills Adolescent Treatment Facility for dates of service 12/5/2016 forward. . . .

Sincerely,

Lee Becker, MD
Associate Medical Director

Appeals and Grievances P.O. Box 3012, Salt Lake City, UT 84130-0512 . . .
**Insurance coverage is provided by UnitedHealthcare Service LLC.**

(Id.) (emphasis in original) (sealed)

On December 9, 2016, Avalon – on behalf of J.S. – appealed the denial of coverage. (See id., Ex. 8 (Dkt. No. 36-2) at 14 (sealed); Pltf. R. 56.1 Resp. (Dkt. No. 39) ¶ 13)

On December 12, 2016, Theodore Allchin, M.D. – a UBH medical director and child psychiatrist – upheld the decision to terminate J.S.'s benefits for residential treatment services. (Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 14) (sealed) Dr. Allchin concluded that "there are no medical issues. Weight is appropriate. There is active involvement in treatment. There are no self harm urges or psychosis. There is no aggression. There is compliance with Zyprexa. Family is supportive." (Id.) (sealed) Accordingly, Dr. Allchin approved "care [to] continue in the mental health partial hospitalization setting" from December 5, 2016 forward. (Id. (sealed); see also Def. R. 56.1 Resp. (Dkt. No. 43) ¶ 38; Pltf. R. 56.1 Resp. (Dkt. No. 39) ¶ 15)

### 2.    Partial Hospitalization Treatment Between December 5, 2016 and February 26, 2017

Sieden accepted benefits for partial hospitalization, but chose to pay an additional "boarding fee" to keep J.S. at Avalon at a residential level of treatment. (Def. R. 56.1 Resp. (Dkt. No. 43) ¶¶ 39-40; Pltf. R. 56.1 Stmt., Ex. 10 (Dkt. No. 34-10) at 87 (Avalon Feb. 8, 2017 letter to UBH stating that on December 12, 2016, Sieden "opted to accept reimbursement for

[partial hospitalization and pay a boarding fee, so as to keep [J.S.] in a clinically appropriate level of care") (sealed); <u>id.</u>, Ex. 1 (Dkt. No. 34-1) at 16 (UBH records indicating that J.S. had remained in a "24 hour highly structured [residential treatment center] equivalent level of care" after December 2016) (sealed)

UBH personnel updated J.S.'s case file approximately every week.  (<u>See</u>, <u>e.g.</u>, Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 7) (sealed)  In a January 5, 2017 update, Kimberly Dema – a Licensed Clinical Professional Counselor ("LCPC") and UBH "care manager" – noted that J.S.'s mother and twin sibling had visited J.S. at Avalon "over [the C]hristmas holiday," but that visit "didn't go as [J.S.] wanted," and as a result J.S. "seems to be in [a] depressive spiral, not getting out of bed until 11 [a.m.] or 1 [p.m.] [and] refusing many meals."  (<u>Id.</u> at 8-9) (sealed) Dema opined that J.S. "doesn't seem to be medically compromised by [an eating disorder] at this time," but instead "seems more depress[ed]."  (<u>Id.</u> at 8) (sealed)

UBH's records from January 2017 reflect a number of questions and concerns by reviewers at this time, including whether J.S. was at Avalon for "behavioral control or [an eating disorder]"; whether the treatment team was adjusting behavioral plans based on J.S.'s progress; whether J.S.'s "continuing [treatment] so far away from family [was] contributing to [her] lack of motivation"; whether "the expectation for [J.S. was] to be completely [symptom-]free and 100% of [her ideal body weight] prior to [her discharge from Avalon]"; and what "the end goal" was for J.S.'s treatment at Avalon.  (<u>Id.</u> at 8-9) (questions dated January 5, 2017)  Dema made an internal note to "consider [the] benefit [of] having [J.S.] transition to [a] program closer to home[,] or [to] an [intensive outpatient program] with intensive family work[.]"  (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 8-9) (sealed)

In a January 20, 2017 update to J.S.'s file, Dema noted that Avalon reported that J.S. was still refusing food and supplements.  (Id. at 9) (sealed)  Given Avalon's report that J.S. only followed "around 55 to 60% of her meal plan," and struggled to get out of bed before 11 a.m., Dema observed that it "[s]eems [J.S.] may only be attending really half of [the partial hospitalization] program" at Avalon.  (Id. at 9, 11) (questioning "what [J.S.] is really doing in program if missing half of the day in bed") (sealed)  J.S. also exhibited a "lack of measurable improvement" in other areas of Avalon's programming.  (Id.)  For example, J.S. had participated in a "positive reinforcement plan" for two months "with limited improvement."  (Id.) (sealed) Dema concluded that J.S. "appears to be deteriorating and [was exhibiting] worse . . . depressive [symptoms]."  (Id.) (sealed)

Despite J.S.'s "decreasing complian[ce] with [Avalon's] program" (id. at 11) (sealed), she remained at about 98% of her ideal body weight, and there were no "reported labs or medical concerns."  (Id. at 9) (sealed)  Dema believed that it was "possible that [a] targeted [discharge] date or prospect of transition to home may help [J.S.]," and that an alternative partial hospitalization program "near home" would "offer more opportunity for family engagement." Accordingly, she referred the case for a "peer review."  (Id. at 11) (sealed)

On January 24, 2017, Dr. Becker interviewed J.S.'s Avalon treatment team in connection with her claim for partial hospitalization.  (See id., Ex. 10 (Dkt. No. 34-10) at 87-88) (sealed)  Dr. Rachel Enoch – a therapist – and nurse practitioner Chad Speth reported that J.S. refused food approximately 80% of the time.  (See id., Ex. 1 (Dkt. No. 34-1) at 11) (sealed) While she was generally compliant with her prescribed medications of Prozac 10 mgs. and Zyprexa 2.5 mgs., she was not compliant with her prescribed vitamins and supplements.  (Id.) (sealed)  And while J.S. did not express an intent or plan to harm herself, she still "reports

passive suicidal ideations." (Id.) (sealed)  The treatment team also reported that since J.S. had

begun treatment at Avalon in September 2016 – more than four months earlier – she had had

only one family visit, which had occurred on Christmas Day.  (Id.) (sealed)  J.S.'s only other

communication with her family was through a weekly telephone call.  (Id.) (sealed)

    After speaking with J.S.'s treatment team, Dr. Becker reviewed J.S.'s case notes

and researched outpatient treatment options located near J.S.'s home.  Dr. Becker noted that  J.S.

had spent four months in Avalon's residential treatment program, and "[t]here appears to be a

lack of reasonably intensive family involvement in [J.S.'s] treatment planning." (Id. at 12)

(sealed)  Dr. Becker concluded that J.S. could safely transition to intensive outpatient treatment.

(Id. at 11-12) (sealed)

    In a January 24, 2017 letter, UBH notified Sieden of its decision to deny further

benefits for partial hospitalization:

> The decision is that benefits are unavailable for Mental Health Partial
> Hospitalization treatment from 01/25/2017 forward.  This is based on UBH Level
> of Care Guidelines and Common Criteria Guidelines for Mental Health Partial
> Hospitalization Level of Care.  Your child was admitted for treatment of weight
> loss and eating disorder symptoms.  After talking with the providers, it was noted
> her condition no longer meets Guidelines for coverage of treatment in this setting.
> She has shown some improvements.  Weight gain has occurred in spite of lack of
> full adherence in treatment.  She is doing her daily tasks.  She is taking her
> medications.  She is not feeling like harming herself or others.  She does not have
> serious medical concerns needing frequent treatment changes and daily care with
> others.  It does not appear there is a reasonable expectation that continued
> treatment in this program will improve the presenting problems further within a
> reasonable period of time.  It appears treatment could continue in the Mental
> Health Intensive Outpatient setting.

(Id., Ex. 11 (Dkt. No. 34-11) at 87) (sealed)

    On behalf of J.S., Avalon appealed the denial of benefits on January 24, 2017 (id.,

Ex. 1 (Dkt. No. 34-1) at 14), and on February 8, 2017 (see id., Ex. 10 (Dkt. No. 34-10) at 87-94)

(sealed).  In the first appeal, Dr. Allchin affirmed the decision to terminate J.S.'s partial

hospitalization benefits.  (Id., Ex. 1 (Dkt. No. 34-1) at 14) (sealed)  In making this determination,

Dr. Allchin identified and considered Avalon's three primary arguments for maintaining partial

hospitalization benefits:  (1) to allow J.S.'s Prozac prescription a longer period of time to take

effect on J.S.'s depressive symptoms; (2) to provide support during meals; and (3) to avoid the

exacerbation of J.S.'s mental health conditions that would result from her return home to her

mother and other family members.  (Id.) (sealed)  Dr. Allchin nonetheless concluded that J.S.'s

treatment could continue at a lower level of care, given that she "has been gaining weight and is

over 90% of ideal body weight" and her "symptoms appear stable."  (Id.) (sealed)

       In its second appeal, Avalon attached a February 8, 2017 letter from Dr. Enoch, a

therapist who had treated J.S. over the previous four months at Avalon.  (Id., Ex. 10 (Dkt. No.

34-10) at 87-94) (sealed)  Dr. Enoch states that "[i]t is the opinion of the treatment team that at

present, [J.S.] still meets [the] criteria for [partial hospitalization]."  (Id. at 88) (sealed)  She then

addresses the following American Psychiatric Association (APA) "[b]est practice" factors for

determining an appropriate level of care:

(1) As to medical status, J.S. is diagnosed with several medical complications as a result
of her "active[] refus[al to eat] many meals and snacks," including malnutrition, low
bone density, and orthostatic hypotension;

(2) As to suicide risk, J.S. "continues to report high rates of suicidal ideation," including
vocalizing thoughts such as she "doesn't deserve to live," and her plan to "jump[] in
front of a car."  Dr. Enoch reports that "[t]hroughout [J.S.'s] residential stay, [she] has
continued to attempt to self-injure by digging her nails into her skin; fortunately, she
is so closely monitored that [such] behavior can't continue.  She would be at high risk
if she were to step down [to a lower level of care]";

(3) As to J.S.'s weight as of January 2017, she is at "95% of her Ideal Body Weight," but
continues to "refuse[] food and supplements daily," and will not "comply [with] table
redirections given by staff," which are behaviors "highly correlated with . . . severe
eating disorders";

(4) As to motivation, J.S. "exhibits very poor to poor motivation for recovery," believing
that "she is 'not worthy of recovery' and demonstrates little to no motivation to do
so."  Over the last two weeks, she woke up on time only 23% of the time, and as a

result, missed meals and group programming.  However, Avalon started a new "behavior plan" to "increase [her] motivation," and she recently woke "up on time four days in a row" under the new plan;

(5) As to co-occurring disorders that would affect J.S.'s treatment needs, "it is clear" that J.S.'s depression and anxiety "both underlie and complicate her eating disorder[] behaviors."  J.S. recently started on fluoxetine 20 mgs., which has improved her mood;

(6) As to structure, "it is evident that highly structured meal and snack[] times are a necessity to manage her dietary restricting behaviors."  J.S. continues to refuse food, "shaking when prompted to take a bite, engaging in negative food talk, closing her eyes, or attempting to plug her nose as she eats";

(7) As to purging, J.S. purged 23% of the time over the last two weeks;

(8) As to psychosocial context and environmental stress, J.S. reports that she "doesn't feel supported at times from her family."  Dr. Enoch stated that Avalon intends to "provide the family with the necessary education around eating disorder[s]," and that its typical practice is to issue "passes" to assist patients like J.S. "to successfully reintegrate with her home environment."  However, J.S. is "currently not able to go on a 'pass' with her family due to her inability to complete her meals/snacks or keep from purging it without constant redirection and prompting."

(Id. at 89-93) (sealed)

        Dr. Enoch also states

that if [J.S.] is stepped down at this time, her relapse is inevitable.  Anything less than authorization of continued [partial hospitalization] with boarding, at this point in time, would undoubtedly result in adverse and serious consequences, which for [J.S.] would include continued dietary restriction and purging behaviors, if not something more imminent, such as suicide.

(Id. at 94) (sealed)

        Dr. Kenneth Fischer, M.D. – a UBH appeals claim manager who is board-certified in child psychiatry – considered Avalon's second appeal regarding continued partial hospitalization benefits.  (Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 29-30) (sealed)  In conducting his review, Dr. Fischer considered Dr. Enoch's February 8, 2017 letter and J.S.'s case notes and other medical records, and spoke with J.S.'s treatment team by telephone for "approximately 65 minutes."  (Id.) (sealed)

As to physical health, Dr. Fischer noted that J.S. "remains physiologically stable," "continues to gain weight, has grown an inch," "is approaching 100% of her [ideal body weight]" on a 3000 calories meal plan, and maintains "normal" bloodwork "except a low Vitamin D for which she is prescribed a supplement."  (Id. at 30) (sealed)  As to mental health, J.S. "takes and tolerates her Prozac and Zyprexa."  (Id.) (sealed)  Dr. Fischer concluded that J.S. was not "actively suicidal [or] dangerous," because she had "not cut or scratched herself for several months."  (Id.) (sealed)  Dr. Fischer saw as a gap in "her ongoing care and treatment planning" "a lack of reasonably intensive family involvement," given that her mother had only visited her twice in person, on Christmas Day 2016, and again over a weekend in February 2017. (Id. at 29-30) (sealed)

Based on his review, Dr. Fischer concluded that J.S. "no longer appears to need the frequent reassessment, frequent change of treatment plan, and daily 24 hour care of the current service intensity."  (Id. at 30)  Instead, "[s]he appear[ed] to be at a point where her coping skills require practice in a less restrictive environment," such as an intensive outpatient treatment program.  (Id.) (sealed)  Dr. Fischer found "an outpatient psychiatrist in [J.S.'s] home area with expertise in eating disorders" who would "monitor and maintain her stability," while "integrating her back into family and community life."  (Id.) (sealed)s

In a February 24, 2017 letter, UBH notified Sieden of its decision to terminate benefits for partial hospitalization services.  (Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 89-90) (sealed)  It paid partial hospitalization benefits for the period between January 25, 2017 and February 26, 2017, but denied coverage for treatment from February 27, 2017 forward.  (Id.) The denial letter reads as follows:

> Based on the [UBH] Level of Care Guideline for the Substance Use Disorder
> Partial Hospitalization Program Level of Care and Common Criteria and Clinical

Best Practices for all levels of care, it is my determination that authorization can be provided from 01/25/2017 through 02/22/2017. Additional days will be administratively authorized from 02/23/2017 through 02/26/2017 to facilitate transition home. However, it is also my determination that no authorization can be provided from 02/27/2017. Your daughter was admitted for treatment of her anxiety, mood and eating disorder. After talking with her providers, it is noted she has made sufficient progress and that her condition no longer meets Guidelines for further coverage of treatment in this setting. She appears to be at a healthy weight. She is in better behavioral control. She takes her medication. She cooperates in programming. She has a supportive family. It does not appear there is a reasonable expectation that continued treatment in this program will improve her presenting problems further within a reasonable period of time. She could continue her recovery at the Mental Health Intensive Outpatient Program Level available near home. This would help monitor and maintain her stability, continue to increase her functioning, develop a support system and further strengthen key relationships with family, friends and treatment professionals, while integrating her back into family and community life. . . .

Please talk to your doctor about your daughter's care. A care advocate is available to discuss additional treatment options and community support[] that are available in your area[.] . . .

This is the Final Adverse Determination of your internal appeal. All internal appeals through [United Behavioral Health] have been exhausted. . . .

(Id. at 90) (sealed)

### 3.     <u>Intensive Outpatient Program Level Covered from February 27, 2017</u>

Despite UBH's decision to deny partial hospitalization benefits from February 27, 2017 forward, J.S. remained at Avalon at the residential level of care. (Id., Ex. 1 (Dkt. No. 34-1) at 18-19 (sealed); Def. R. 56.1 Resp. (Dkt. No. 43) ¶ 97)

On November 15, 2017, Avalon contacted UBH to request approval for residential treatment, claiming that J.S.'s condition had worsened. (Def. R. 56.1 Stmt. (Dkt. No. 36) (Administrative Record) at AR 396-97, 399 (sealed); Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 120) J.S.'s treatment team reported to Chad Touchette, Licensed Marriage and Family Therapist ("LMFT") and UBH family therapist – that J.S. eats only "25% of [her] meals," was "trigger[ed] to self-harm [with a] pencil sharpener," and "purg[ed]" on November 6, 2017, despite being

compliant with her prescribed medication, which was amended in June 2017 to include

Olanzapine 2.5 mgs. (a generic form of Zyprexa) and Fluoxetine 80 mgs.  (Pltf. R. 56.1 Stmt.,

Ex. 1 (Dkt. No. 34-1) at 18-19; see also Def. R. 56.1 Stmt. (Dkt. No. 36) (Administrative

Record) at AR 397, 403) (sealed)  UBH's records indicate concern that – given J.S.'s placement

at Avalon since September 2016 – Avalon "does not have [a] detailed treatment plan" or

"treatment goals" as to "how they are going to address [J.S.'s] new eating disorder behaviors."

(Id. at 18-19) (sealed)  Touchette referred the case for peer review.  (Id. at 18) (sealed)

Sheryl D. Jones, M.D. – a UBH Associate Medical Director and psychiatry

specialist – conducted that review.  (Def. R. 56.1 Stmt. (Dkt. No. 36) (Administrative Record) at

AR 401-04) (sealed)  According to Dr. Jones, three members of J.S.'s Avalon treatment team

told her that "'[J.S.] has made 'quite a bit of progress'"; her prescription dosage remained stable

for a month; she "is purging less"; "her [eating disorder] symptoms are significantly less"; her

laboratory test results on November 17, 2017 "were grossly [within normal limits]"; and she

successfully spent an evening with her mother in early November 2017.  (Id. at 402-03) (sealed)

In making her determination, Dr. Jones took "into consideration the available

information [provided by Touchette], along with the additional clinical information given by [the

Avalon treatment team] . . . , and also the locally available clinical services."  (Id. at 403-04)

(sealed)  She noted that J.S. "has been in intensive treatment at [a residential treatment level of

care] for the past 14 months" and – as of November 2017 – "is medically stable," "maintaining a

healthy weight," and "is not suicidal, homicidal, psychotic, . . . or otherwise a danger to herself

or others."  (Id. at 403) (sealed)  While J.S.'s "mood is anxious and depressed," Avalon had not

changed her medication "in more than a month," and she "has reportedly shown some

improvement over the past few weeks."  (Id.) (sealed)

In a November 22, 2017 letter, UBH informed Sieden that it was denying benefits for J.S.'s "admission to Avalon," having determined that J.S. "could safely and effectively continue care in the Mental Health Outpatient [o]r Intensive Outpatient setting." (Def. R. 56.1 Stmt. (Administrative Record) at AR 2844) (sealed):

> Based on the [UBH] Level of Care Guideline for the Mental Health Inpatient Level of Care, it is my determination that no authorization can be provided from 11/15/2017 forward. Your child was admitted for treatment of mood and behavioral problems and for treatment of an eating disorder. I did not speak with your child's doctor. Your child's doctor was not available to discuss her care. After talking with your doctor's designees, it seems that your child has made progress and that her condition does not meet guidelines for coverage of treatment in this setting. She is medically stable. She is not requiring any medication changes or adjustments. She is maintaining a healthy weight. She is thinking clearly and is able to participate in her care. Her eating disorder symptoms have improved. She has your support. She does not seem to need 24 hour monitoring, support or care.

(Id.) (sealed)

Between February and December 2017, Sieden periodically submitted claims to recover the cost of J.S.'s treatment at Avalon, all of which were denied. (See, e.g., Def. R. 56.1 Stmt., Ex. 11 (Dkt. No. 36-5) at 2-7 (October 30, 2017 claim for $4,200); id., Ex. 12 (Dkt. No. 36-6) at 2-6 (November 16, 2017 claim for $5,600); id., Ex. 13 (Dkt. No. 36-7) at 2-8 (December 18, 2017 claim for $27,300)) (sealed)

J.S. was discharged from Avalon on May 10, 2018, at about the time of her mother's death. (Def. R. 56.1 Resp. (Dkt. No. 43) ¶ 136; Def. R. 56.1 Stmt. (Administrative Record) at AR 657-63 (sealed)) After J.S.'s discharge, Avalon submitted claims to UBH. (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 20-96) (sealed) UBH did not respond to these post-service claims. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 144)

## II.    PROCEDURAL HISTORY

The Complaint was filed on October 28, 2019.  (Cmplt. (Dkt. No. 3))  Plaintiff Savage brings this action – as executor of the estate of Cindy Sieden – pursuant to Section 502(a) of ERISA.  The Complaint asserts that Sieden's daughter, J.S., was wrongfully denied benefits under the terms of the Rabobank Medical Plan, a welfare benefit plan that is sponsored by Sieden's employer, Rabobank, and administered by UnitedHealthcare.  (Id. at ¶ 1)  Plaintiff seeks $440,000 in unpaid benefit claims, as well as an award of costs and attorneys' fees.  (Id. ¶ 27; see also id. at 7, ad damnum clause)

On August 24, 2020, the parties cross-moved for summary judgment.  (Pltf. Mot. (Dkt. No. 29); Def. Mot. (Dkt. No. 26))

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Review of a Denial of Benefits under Section 502(a) of ERISA

Section 502(a) of ERISA, codified at 29 U.S.C. § 1132(a), permits a beneficiary of an employee welfare benefit plan to bring a civil action "to recover benefits due to [her] under the terms of [her] plan [and] to enforce [her] rights under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  ERISA does not "'mandate what kind of benefits employers must provide,'" and "employers have large leeway to design . . . welfare plans as they see fit."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833 (2003) (quoting Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996)).  But the administrator of an ERISA plan is obligated to "focus on the written terms of the plan" in making benefit determinations, and to ensure "that the plan is 'maintained pursuant to [the] written instrument.'"  Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013) (quoting 29 U.S.C. § 1102(a)(1)).

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); accord Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 737-38 (2d Cir. 2001) (same). Where the plan grants such discretionary authority, courts "'will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious.'" Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009) (quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995)). "The plan administrator bears the burden of proving that the deferential standard of review applies." Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002) (citation omitted).

An administrator's decision to deny benefits under an ERISA plan is arbitrary and capricious "'only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Hobson, 574 F.3d at 83 (quoting Pagan, 52 F.3d at 442). "Substantial evidence" is "'evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla of evidence but less than a preponderance.'" Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995) (alterations in original) (quoting Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)).

"This scope of review is narrow," and the question at summary judgment is "'not whether [the plan administrator] made the correct decision,'" but whether the evidence, viewed in the light most favorable to the non-moving party, could support the conclusion that the administrator "'had a reasonable basis for the decision that it made.'" Hobson, 574 F.3d at 83, 89 (quoting Chalker v. Raytheon Co., 291 Fed. App'x. 138, 145 (10th Cir. 2008)); see also Davis

v. Com. Bank of New York, 275 F. Supp. 2d 418, 425 ("'The reviewing court need only assure

that the administrator's decision falls somewhere on a continuum of reasonableness – even if on

the low end.'") (quoting Cirulis v. UNUM Corp., 321 F.3d 1010, 1013 (10th Cir. 2003)).

"'[A]bsent a showing of bad faith or arbitrariness, the court will not disturb [the administrator's]

interpretations of the plan as long as they are consistent with the plan's terms and purpose.'"

Sansevera v. DuPont de Nemours & Co., 859 F. Supp. 106, 112 (S.D.N.Y. 1994) (quoting Seff v.

NOITU Ins. Trust Fund, 781 F. Supp. 1037, 1040 (S.D.N.Y. 1992)).

       A court reviewing a plan administrator's benefits decision is "'not free to

substitute [its] own judgment for that of [the administrator] as if [it] were considering the issue of

eligibility anew.'"  Hobson, 574 F.3d at 83-84 (quoting Pagan, 52 F.3d at 442).  Indeed, "nothing

'in [ERISA's] legislative history suggests that Congress intended that federal district courts

would function as substitute plan administrators,'" particularly given ERISA's "'goal of prompt

resolution of claims by the fiduciary.'"  Miller, 72 F.3d at 1071 (quoting Perry v. Simplicity

Eng'g, 900 F.2d 963, 966 (6th Cir. 1990)).  "Where both the plan administrator and a spurned

claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's

interpretation must be allowed to control."  McCauley v. First Unum Life Ins. Co., 551 F.3d 126,

133 (2d Cir. 2008) (quoting Pulvers v. First UNUM Life Insurance Co., 210 F.3d 89, 92-93 (2d

Cir. 2000)).

       In reviewing the decision of a claims administrator under the arbitrary and

capricious standard, a district court "is limited to the administrative record."  Miller, 72 F.3d at

1071; Bergquist v. Aetna U.S. Healthcare, 289 F. Supp. 2d 400, 411 (S.D.N.Y. 2003) ("The

Court must limit its examination of evidence to the administrative record [and information

available to the plan administrator at the time it made its decision] when reviewing

administrative decisions under the arbitrary and capricious standard.").

        Where, as here, a district court is tasked with reviewing a denial of benefits under

an ERISA plan, summary judgment is "an appropriate vehicle whereby the Court can apply

substantive ERISA law to the administrative record." <u>Gannon v. Aetna Life Ins. Co.</u>, No. 05

Civ. 2160 (JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007); <u>Anderson v. Sotheby's,</u>

<u>Inc.</u>, No. 04 Civ. 8180 (SAS), 2006 WL 1722576, at *14 (S.D.N.Y. 2006) (in a case challenging

the denial of benefits under an ERISA plan, "'a motion for summary judgment is merely the

conduit to bring the legal question before the district court'") (quoting <u>Bendixen v. Standard Ins.</u>

<u>Co.</u>, 185 F.3d 939, 942 (9th Cir. 1999)).  Because "there are no disputed issues of fact for the

court to resolve," the usual Rule 56 summary judgment standard "do[es] not apply," and "the

district court sits in effect as an appellate court to determine whether the denial of ERISA

benefits was arbitrary and capricious." <u>Anderson</u>, 2006 WL 1722576, at *14 (citations and

internal quotation marks omitted).

## II.    <u>ANALYSIS</u>

### A.    <u>Standard of Review for UBH's Benefits Determinations</u>

        As discussed above, the ERISA plan at issue grants UnitedHealthcare "the

discretion and authority to decide whether a treatment or supply is a Covered Health Service and

how the Eligible Expenses will be determined and otherwise covered under the Plan." (Pltf. R.

56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 105) (sealed)  UnitedHealthcare is authorized under the

Plan to "delegate [its] discretionary authority to other persons or entities that provide services in

regard to the administration of the Plan." (<u>Id.</u>, Ex. 12 (Dkt. No. 34-12) at 78) (sealed)  Here,

United Healthcare has delegated administration of mental health claims to UBH.  (<u>See</u> Pltf. R.

56.1 Stmt. (Dkt. No. 34) ¶ 4)

Where, as here, an ERISA plan has "confer[red] upon a [claims] administrator the discretionary authority to determine eligibility," the claims administrator's benefit determinations are reviewed under the arbitrary and capricious standard.  See Hobson, 574 F.3d at 82 (citation and internal quotation marks omitted).

Plaintiff argues, however, that this Court's review should be de novo, because UBH "failed to consider and decide the post-service claims submitted for J.S.'s treatment at Avalon."  (Pltf. Br. (Dkt. No. 30) at 20)  According to Plaintiff, by "never consider[ing] the merits of the entirety of J.S.'s partial hospitalization" treatment, UBH did not exercise discretion such that arbitrary and capricious review is warranted.  (Id.)  Plaintiff's argument is not persuasive.

As discussed above, UBH denied partial hospitalization benefits in a January 24, 2017 letter, and Avalon – on J.S.'s behalf – pursued two appeals of that determination, which UBH denied.  (Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 87) (sealed)  In a February 24, 2017 letter, Dr. Fischer notified J.S.'s mother that UBH was issuing a "Final Adverse Determination" of her second appeal.  (See id. at 89-90)  UBH was not required to consider a third appeal regarding its denial of partial hospitalization benefits.

The cases cited by Plaintiff are not to the contrary (see Pltf. Br. (Dkt. No. 30) at 20-21), because they involve circumstances in which the claims administrator violated ERISA by not timely considering a claim or addressing an initial appeal.  See Gritzer v. CBS, Inc., 275 F.3d 291, 294 (3d Cir. 2002) (administrator "failed to respond" to initial claim in a timely manner); Capianco v. Long-Term Disability Plan of Sponsor Uromed Corp., 247 F. App'x 885, 886 (9th Cir. 2007) (administrator "never rendered a final decision" on first appeal).  ERISA "requires only a single mandatory review," which must be provided in a timely manner, but any additional

"voluntary appeals" do not require "ERISA safeguards." DaCosta v. Prudential Ins. Co. of Am.,
No. 10 Civ. 720 (JS) (ARL), 2010 WL 4722393, at *5-6 (E.D.N.Y. Nov. 12, 2010) (citing 29
U.S.C. § 1133(2)).

   And to the extent that Plaintiff argues that UBH has "a financial interest in the
outcome of the benefit determination" (Pltf. R. 56.1 Resp. (Dkt. No. 39) ¶ 2), that argument does
not require a change in the standard of review.

   Where a claims administrator has a dual role in "both evaluat[ing] . . . and
pay[ing] benefits claims," and thus operates under a structural conflict of interest, that conflict is
a factor that "'must be weighed'" by the district court in determining whether the administrator
abused its discretion in denying benefits. See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 122,
120 (2008) (quoting Firestone, 489 U.S. at 115); Durakovic v. Bldg. Serv. 32 BJ Pension Fund,
609 F.3d 133, 139 (2d Cir. 2010) (weighing a conflict of interest "in direct proportion to the
'likelihood that [the conflict] affected the benefits decision'") (quoting Glenn, 554 U.S. at 118).
But here, the parties agree that the Plan is "self-funded" by Rabobank. (Pltf. R. 56.1 Stmt. (Dkt.
No. 34) ¶ 1; Pltf. R. 56.1 Resp. (Dkt. No. 39) ¶ 1) Accordingly, UBH – as an independent claims
administrator – has no direct financial interest in granting or rejecting claims, or any other
"conflict actually affect[ing] [its] decision," Durakovic, 609 F.3d at 140, and therefore there is no
reason for this Court to apply a less deferential standard of review. See Jones v. PepsiCo, Inc.,
185 F. Supp. 3d 437, 444 (S.D.N.Y. 2016) (collecting cases for the proposition that "the majority
of federal courts have found that third-party [claims] administrators" – such as UBH – "do not
have a conflict of interest").

   This Court concludes that the arbitrary and capricious standard of review governs
here.

B.     **Whether UBH's Benefits Determinations Were Arbitrary and Capricious**

Plaintiff argues that UBH acted in an arbitrary and capricious manner in denying benefits for (1) residential-level care after December 5, 2016; (2) partial hospitalization-level care after February 27, 2017; and (3) residential level care after November 15, 2017. According to Plaintiff, UBH's (1) benefit determinations lack any rational basis and are not supported by substantial evidence; and (2) Level of Care Guidelines violate Plan provisions.

1.     **Whether UBH's Benefit Determinations Have a Rational Basis and Are Supported by Substantial Evidence**

a.     **Denial of Benefits for Residential-Level Care After December 5, 2016**

In a December 13, 2016 letter, UBH informed Sieden that "benefits are unavailable for [J.S.'s] mental health residential treatment [at Avalon] for 12/5/2016 forward." (Def. R. 56.1 Stmt., Ex. 9 (Dkt. No. 36-3) at 3) (sealed)

The denial letter begins by citing UBH's Level of Care Guidelines. (See id., Ex. 5 (Dkt. No. 33-6) at 10) Under the Guidelines, a member or beneficiary would qualify for residential treatment where her "[p]yschosocial and environmental problems . . . are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in [the residential] level of care." (Id. at 21)

In applying the Guidelines, Elhasan, Dr. Becker, and Dr. Allchin each concluded that treatment of J.S.'s condition could safely "continue in the mental health partial hospitalization setting," because of the "progress" "she has made" while in residential care. (Id., Ex. 9 (Dkt. No. 36-3) at 3 (Dr. Becker's December 13, 2016 letter denying further benefits for residential care); see id., Ex. 8 (Dkt. No. 36-2) at 8-10 (Elhasan's December 4, 2016 review); id. at 14 (Dr. Allchin's December 12, 2016 decision upholding denial on appeal) (sealed)

The record shows that when benefits for residential care were terminated, J.S. weighed 98.8 lbs – a "significant weight gain" from when she arrived at Avalon – "was not purging or binge purging," and did "not have significant behavioral disturbances[,] . . . such that she or others would be endangered without 24-hour care." (Id., Ex. 8 (Dkt. No. 36-2) at 11-12) (Dr. Becker's December 7, 2016 notes); id., Ex. 9 (Dkt. No. 36-3) at 3 (Dr. Becker's December 13, 2016 denial letter) (sealed)  J.S. was also "active[ly] involve[d] in treatment," responding "well to positive reinforcement," "generally" compliant with her meal plan, and taking her prescribed Zyprexa 2.5 mgs. medication. (Id., Ex. 8 (Dkt. No. 36-2) at 9; id. at 14 (Dr. Allchin noting that "there are no medical issues") (sealed)  And at some point prior to December 4, 2016, Avalon held a "family session" with Sieden to "discuss[] how to support [J.S. at] home." (Id. at 9) (sealed)  Avalon reported that J.S.'s "family is supportive," and confirmed that the Avalon treatment team would "work with [J.S.'s] family regarding rules[,] regulations[,] and monitoring at home." (Id. at 9, 12) (sealed)

For these reasons, UBH concluded that J.S. "does not have seem to have significant medical concerns needing 24-hour nursing care," and accordingly "no longer meets Guidelines for coverage of [residential] treatment."  (See id., Ex. 9 (Dkt. No. 36-3) at 3 (Dr. Becker's December 13, 2016 denial letter); id. at 9 (Elhasan concluding that J.S. "can return home," and her "ongoing positive reinforcement . . . could be modified for accessibility to resources in [a lower level of care or a] home environment"); id., Ex. 8 (Dkt. No. 36-2) at 14 (Dr. Allchin concluding – in his December 12, 2016 letter upholding the denial of benefits determination on appeal – that J.S.'s "[c]are could continue in the mental health partial hospitalization setting")

In challenging UBH's factual findings in denying residential-level care after December 5, 2016, Plaintiff notes that "[J.S.'s] treatment team advised UBH that 'it would be illogical at this time to believe that [J.S.] could complete meals at a lower level of care."  (Pltf. Br. (Dkt. No. 30) at 11) (quoting Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 9)

However, the mere fact that J.S.'s treatment team recommends a different approach to her treatment and a higher level of care does not demonstrate that UBH's decision to deny coverage for that treatment was arbitrary and capricious.  See Nord, 538 U.S. at 834 ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.").

UBH's records show that Elhasan and Dr. Becker spoke with three members of J.S.'s Avalon treatment team – J.S.'s utilization reviewer, therapist Hines and nurse practitioner Speth – and took "into consideration" the team's concerns.  (See, e.g., Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 9 (noting that J.S.'s utilization reviewer at Avalon believed that "it would be illogical to think that [J.S.] could complete[] meals if [discharged] to home or to [a lower level of care]"); id. at 12 (noting that Hines and Speth "indicated that the key reason for continued [residential treatment] is that [J.S.] has made gains but they feel that she will regress without continued 24-hour structure"; "[Hines and Speth] feel she is [at] a high risk of relapse without continued 24-hour care") (sealed)

UBH nonetheless concluded that a termination of benefits for residential-level care was appropriate, given that J.S. had "no medical issues," her "weight is stable," she "is active in her treatment," "is not acting on every feeling," and "does not seem to have significant

medical concerns needing 24-hour nursing care." (Id. at 12, 14) (sealed)  Given these circumstances, J.S. mental conditions did not "threaten [her] safety or undermine engagement in a less intensive level of care without the intensity of services offered in [a residential] level of care." (Id., Ex. 5 (Dkt. No. 33-6) at 21) (Guidelines provisions concerning residential treatment)

The Court concludes that UBH has offered a rational basis for its determination to terminate benefits for residential care on December 5, 2016, and that it has offered substantial evidence in support of that determination.

### b.    Denial of Benefits for Partial Hospitalization-Level Care After February 27, 2017

As discussed above, in a February 24, 2017 letter, UBH denied partial hospitalization benefits after February 27, 2017.  (Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 89-90) (sealed)

Partial hospitalization is a "structured program" intended "to stabilize and reduce acute signs and symptoms, increase functioning, and assist a member with integrating into community life."  (See Def. R. 56.1 Stmt., Ex. 5 (Dkt. No. 33-6) at 17)  As discussed above in connection with UBH's decision to deny benefits for residential-level care after December 5, 2016, the Plan gives UBH discretion to adopt, interpret, and apply its Level of Care Guidelines with respect to partial hospitalization benefit determinations.

UBH provided several justifications for its decision to terminate benefits for partial hospitalization-level care after February 27, 2017, including (1) J.S.'s improved physical health; and (2) the need to strengthen J.S.'s relationship with her family and to integrate her back into her family and community.

As to J.S.'s physical health, the record demonstrates that by February 2017, she had returned to a "healthy weight," had normal bloodwork, was generally in compliance with her

prescribed psychiatric medications and meal plan, and no longer was experiencing active suicide

ideation.  (See, e.g., Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 87) (January 24, 2017 letter

referencing J.S.'s "[w]eight gain" "in spite of lack of full adherence in treatment," and noting

that "[s]he is taking her medications"); id. at 90 (February 24, 2017 letter noting that J.S.

"appears to be at a healthy weight"); Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 30 (Fischer

noting that J.S. generally maintains "normal" bloodwork); Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No.

34-1) at 8-9 (Reviewer Dema opining as of late January 2017 that J.S. "doesn't seem to be

medically compromised by [her eating disorder]" and had no "reported lab or medical

concerns"); id. at 11 (Dema noting that as of late January 2017, J.S. was not expressing an

"intent or plan" to harm herself) (sealed)  UBH's Dr. Becker, Dr. Allchin, and Dr. Fischer all

concurred that given the improvements in J.S.'s mental and physical condition, she no longer

met the Level of Care Guidelines for partial hospitalization treatment.

UBH's medical personnel and reviewers also expressed the view that a less

restrictive level of care would be more "safe[], efficient[], and effective[]" in J.S.'s treatment,

because it would facilitate greater family involvement in her care.  (See Def. R. 56.1 Stmt., Ex. 5

(Dkt. No. 33-6) at 10) (Guidelines)  J.S.'s treatment team had reported to UBH medical

personnel and reviewers that over a four-month period between J.S.'s September 22, 2016

admission and January 24, 2017, her family had only visited her once.  (Pltf. R. 56.1 Stmt., Ex. 1

(Dkt. No. 34-1) at 11) (sealed)  Dr. Fischer concluded that a significant obstacle in J.S.'s medical

treatment was "a lack of reasonably intensive family involvement"; that there is "evidence . . .

for family work in the context of [J.S.'s] eating disorder" (Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-

2) at 30) (February 22, 2017 notes) (sealed); and that J.S. needed to "strengthen key relationships

with family, friends[,] and treatment professionals" and "integrat[e]" with her "family and

community life."  (Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 90) (February 24, 2017 letter) (sealed)

        Dr. Fischer's concern about a lack of family involvement was echoed by other UBH medical personnel and reviewers.  (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 8 (Reviewer Dema questioning, on January 5, 2017, whether "continuing [treatment] so far away from family contribut[es] to [J.S.'s] lack of motivation," and considering "benefit [of] having [J.S.] transition to program closer to home"); see also id. at 12 (Dr. Becker stating, on January 24, 2017, that "[t]here appears to be a lack of reasonably intensive family involvement in [J.S.'s] treatment planning") (sealed)

        Given J.S.'s disengagement from her family, several of the UBH medical reviewers researched treatment options located closer to J.S.'s home (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 11) (sealed), and Dr. Fischer identified an "outpatient psychiatrist in her home area with expertise in eating disorders," who could help her "integrat[e] back into family and community life."  (Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 30) (sealed)  J.S.'s treatment team represented – as early as December 5, 2016 – that they would "work with her family regarding rules[,] regulations[,] and monitoring at home" (id. at 12), and Dr. Fischer had concluded that J.S. "appear[ed] to be at a point where her coping skills require practice in a less restrictive environment." (Id. at 30) (sealed)  In sum, UBH's medical reviewers concluded as of February 2017 that J.S. could be treated safely – and more effectively – at a less restrictive level of care facility closer to her family and community.

Plaintiff now argues, however, that UBH's decision to deny further benefits for partial hospitalization-level care was (1) "not based on substantive evidence"; and (2) not based on a "full and fair review of the evidence submitted."[7]  (Pltf. Opp. (Dkt. No. 37) at 16-20)

In arguing that UBH's decision was not supported by substantial evidence, Plaintiff cites portions of the administrative record in which J.S.'s treatment team at Avalon and UBH's reviewing physicians disagree in their medical assessments of her condition.  (Id. at 18-20)  For example, while J.S.'s treatment team at Avalon expressed concern that her "return home to her mother would exacerbate [her] symptoms" (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 14, 17) (sealed), Dr. Fischer and Dr. Becker concluded that she needed to "strengthen key relationships with family" and "integrat[e]" with her "family and community life."  (Id., Ex. 11 (Dkt. No. 34-11) at 90) (Dr. Fischer's February 24, 2017 letter); Def. R. 56.1 Stmt., Ex. 8 (Dkt. No. 36-2) at 30) (Dr. Fischer's notes indicating that J.S. "appears to be at a point where her coping skills require practice in a less restrictive environment," and that "her care could continue at this point in an [intensive outpatient program]"); Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at

---

[7]  In this regard, Plaintiff complains that UBH "failed to issue a written appeal letter notifying . . . Sieden of the reasons for [denying] partial hospitalization" and did not "consider the post-service claims."  Plaintiff contends that these "procedural violation[s]" "raise[] questions about the thoroughness and accuracy" of UBH's benefits determinations.  (Pltf. Br. (Dkt. No. 30) at 30) (citation omitted)  While "procedural irregularities in the administrative process . . . constitute factors" that a court should consider, Diamond v. Reliance Standard Life Ins., 672 F. Supp. 2d 530, 535 (S.D.N.Y. 2009), Plaintiff "has not identified any actionable irregularities here."  Stern v. Oxford Health Plans, Inc., No. 12 Civ. 2379 (JFB), 2013 WL 3762898, at *12 (E.D.N.Y. July 17, 2013) (concluding that claim administrator's reliance on internal guidelines in declining coverage is not a "procedural irregular[y] that should weigh in plaintiff's favor").

As to Plaintiff's complaint regarding the absence of a written appeal determination, Dr. Fischer's February 24, 2017 letter denying the appeal is in the record.  (See Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 89-90) (sealed)  As to post-service claims – and for the reasons discussed above – UBH was not obligated to respond to Plaintiff's third appeal concerning its benefit determinations.  See DaCosta, 2010 WL 4722393, at *6 (noting that additional "voluntary appeals . . . lack ERISA safeguards").

12 (Dr. Becker noting that, as of January 24, 2017, "[t]here appears to be a lack of reasonably intensive family involvement in [J.S.'s] treatment planning") (sealed)

As discussed above in connection with UBH's denial of benefits for residential-level care, however, UBH was "not required to accord special deference to the conclusions of [J.S.'s treatment team]," Durakovic, 609 F.3d at 141, and it "acted within its discretion" in relying on the opinions of its reviewing physicians. Hobson, 574 F.3d at 85; see also Nord, 538 U.S. at 834 (ruling "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician"); Stern, 2013 WL 3762898, at *11 (ruling that claims administrator was "entitled to rely on the opinions of its reviewing physicians [–] all of whom concluded that this treatment was not medically necessary" – over the conflicting opinions of plaintiff's treatment team). As discussed above, three UBH physicians – Dr. Becker, Dr. Allchin, and Dr. Fischer – reviewed J.S.'s file and provided "detailed, substantive" explanations for their determinations that she did not require a partial hospitalization level of care, and would benefit from re-integration with her family, home life, and community. Hobson, 574 F.3d at 85.

Plaintiff argues, however, that UBH's own reviewers did not agree as to whether she had made progress at Avalon, citing Dr. Fischer's conclusion that J.S. had "made 'sufficient progress'" at Avalon by February 2017, while Reviewer Dema had noted – in January 2017 – that J.S.'s depression and anxiety "'appears to be deteriorating and getting worse.'" (Pltf. Opp. (Dkt. No. 37) at 19) (quoting first Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 17, and then quoting id., Ex. 1 (Dkt. No. 34-1) at 9) As UBH explained in its denial letters, however, the course of J.S.'s treatment at Avalon presented both positives and negatives, including, inter alia, improvements in J.S.'s weight, physical condition, and acute psychiatric symptoms – including

suicidal ideation – but also declining compliance with Avalon's program, a lack of motivation, and a need to integrate with her family and community.  (See Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 87 (January 24, 2017 letter denying continued partial hospitalization benefits); id. at 89-90 (February 24, 2017 letter denying appeal)) (sealed)

   In making his determination that continued partial hospitalization benefits were not appropriate, Dr. Becker acknowledged that in January 2017 J.S. was still refusing food 80% of the time, and was refusing to take vitamins and other supplements.  (Id., Ex. 1 (Dkt. No. 34-1) at 11) (sealed)  In weighing the positive and negative aspects of J.S. condition as of February 2017, however, Dr. Becker was also required to consider whether "there is a reasonable expectation that continued treatment" in a partial hospitalization program would "improve [J.S.'s] presenting problems further within a reasonable time."  (See Def. R. 56.1 Stmt., Ex. 5 (Dkt. No. 33-6) at 10-11) (Guidelines) (requiring, as a condition for coverage, that "there is a reasonable expectation that [requested] services will improve the member's presenting problems within a reasonable period of time")  Dr. Becker and Dr. Fischer both concluded – in light of the five months that J.S. had already spent at Avalon – that there was no such reasonable expectation.  (Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 87) (Dr. Becker concluding that "[i]t does not appear there is a reasonable expectation that continued [partial hospitalization] treatment [at Avalon] will improve [J.S.'s] presenting problems further within a reasonable period of time."); id., Ex. 11 (Dkt. No. 34-11) at 90 (Dr. Fischer reaching the same conclusion) (sealed)

   Weighing such medically complex and conflicting evidence is the role of plan administrators, and this Court cannot "'substitute [its] own judgment'" for theirs.  Hobson, 574 F.3d at 83-84 (quoting Pagan, 52 F.3d at 442); see also Waterbury v. Liberty Life Assurance Co.

of Bos., No. 03 Civ. 1492 (DNH), 2005 WL 8169569, at *5 (N.D.N.Y. Dec. 22, 2005), aff'd sub

nom. Waterbury v. Liberty Life Assur. Co., 202 F. App'x 477 (2d Cir. 2006) ("In making the

eligibility determination a plan administrator is called on to weigh and balance conflicting

medical evidence.").

       In asserting that UBH did not conduct a "full and fair review," Plaintiff complains

that UBH did not properly consider all the medical evidence on appeal, ignoring "Dr. Enoch's

[February 8, 2017] appeal letter, Ms. Sieden's appeal letter, and over 200 pages of treatment

records." (Pltf. Opp. (Dkt. No. 37) at 16-17) While those claiming benefits under an ERISA

plan must be afforded a "full and fair review" of their claim that "takes into account all

comments, documents, records, and other information [that has been] submitted," 29 C.F.R. §

2560.503-1; see also Cook v. N.Y. Times Co. Long-Term Disability Plan, No. 02 Civ. 9154

(GEL), 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30, 2004) (noting that a "full and fair review"

includes "knowing what evidence the decision-maker relied upon, having an opportunity to

address the accuracy and reliability of that evidence, and having the decisionmaker consider the

evidence presented by both parties prior to reaching and rendering his decision"), there is no

evidence here that the UBH did not consider all of the material submitted in support of J.S.'s

claim.

       Indeed, UBH's case notes document extensive and regular communication

between UBH reviewers and J.S.'s treatment team at Avalon. (See, e.g., Pltf. R. 56.1 Stmt., Ex.

1 (Dkt. No. 34-1) at 7-9) (Reviewer Dema notes from her conversations with J.S.'s utilization

reviewer at Avalon and with the "facility" in general); id. at 11 (Dr. Becker's notes from his

"[l]ive review" with therapist Dr. Enoch and nurse practitioner Speth at Avalon) (sealed) And

Dr. Fischer's notes make clear that he was well aware of Dr. Enoch's view that partial

hospitalization benefits should be continued, and why she believed that these benefits should be continued.  (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 16) (Dr. Fischer notes reporting that "Dr. Enoch subsequently noted [in her February 8, 2017 letter] that . . . [a] variable affecting the family dynamic was mom's job requiring long hours (most nights [un]til 7 [p.m.])," which would prevent Sieden from "engag[ing with J.S.] at meal times and after school") (citing id., Ex. 10 (Dkt. No. 34-10) at 87-94 (Dr. Enoch's February 8, 2017 letter)) (sealed)  Dr. Fischer also reviewed J.S.'s case file, seven notes recorded by nurse practitioner Speth dated as of January 2017 documenting J.S.'s "progress" at Avalon, and his own notes from the "approximately 65 minute[]" discussion he had with J.S.'s treatment team at Avalon.  (Id.) (sealed)

And in Dr. Fischer's February 24, 2017 letter denying further benefits for partial hospitalization services, Dr. Fischer explained why "[J.S's] condition no longer meets Guidelines for further coverage of treatment in [the partial hospitalization] setting," and that an outpatient treatment program "available near [J.S's] home . . . would help monitor and maintain her stability, continue to increase her functioning, develop a support system and further strengthen key relationships with family, friends and treatment professionals, while integrating her back into family and community life."  (Id., Ex. 11 (Dkt. No. 34-11) at 89-90) (sealed)

The Court concludes that UBH provided J.S. with a "fair and full" review of her claim, and explained why benefits for partial hospitalization were being terminated.  The Court further concludes that UBH's decision terminating benefits for these services in February 2017 was supported by substantial evidence.[8]

---

[8]  Dwyer v. United Healthcare Ins. Co., No. 23-50439, ___ F.4th ___, 2024 WL 4230125, at *6 (5th Cir. Sept. 19, 2024) – cited by Plaintiff (Pltf. Sept. 20, 2024 Ltr. (Dkt. No. 59) at 2) – is not to the contrary.  In Dwyer, the district court upheld on de novo review United Healthcare's decision to deny a beneficiary partial hospitalization coverage for his eating disorder.  The Fifth

c.    **Denial of Benefits for Residential-Level
Care as of November 15, 2017**

In a November 22, 2017 letter, UBH denied benefits for J.S.'s "admission to Avalon" for residential-level care after November 15, 2017.  (Def. R. 56.1 Stmt. (Administrative Record) at AR 2844) (sealed)

The UBH denial letter stemmed from Avalon's report that J.S. condition had worsened.  (Def. R. 56.1 Stmt. (Dkt. No. 36) (Administrative Record) at AR 397, 399 (sealed); Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 120)  J.S.'s treatment team had reported to UBH that J.S. eats only "25% of [her] meals," was "trigger[ed] to self-harm [with a] pencil sharpener," and "purg[ed]" on November 6, 2017, despite being compliant with her prescribed psychiatric of Olanzapine 2.5 mgs. and Fluoxetine 80 mgs.  (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 18-19; see also Def. R. 56.1 Stmt. (Dkt. No. 36) (Administrative Record) at AR 397, 402-03) (sealed)  UBH's records indicate concern that – given J.S.'s placement at Avalon since September 2016, more than fourteen months – Avalon "does not have [a] detailed treatment plan" or "treatment goals" as to "how they are going to address [J.S.'s] new eating disorder behaviors."  (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 18-19) (noting that "[Avalon] was not clear on all treatment goals")

---

Circuit reversed, finding that the beneficiary was "substantive[ly]" entitled to partial hospitalization and procedurally denied a "full and fair review" of his claim.  Dwyer, 2024 WL 4230125, at *4.  In reaching this result, the Fifth Circuit explained that United Healthcare did not "engage in [any] dialogue at all" with the beneficiary, even though the beneficiary specifically requested "'explicit written support for [United Healthcare's] decision.'"  Id. at *3, *7.  As to the beneficiary's initial request for partial hospitalization benefits, United Healthcare "failed to state '[t]he specific reason or reasons for the adverse determination,'" "'the specific plan provisions on which the determination is based,'" or how the beneficiary's "medical circumstances were evaluated under the plan."  Id. at *7.  As to the beneficiary's appeal, UnitedHealthcare "acknowledged receiving th[e] appeal [but] [i]nexplicably . . . never responded to it."  Id. at *3.

There are no comparable facts here.  As discussed above, UBH engaged in extensive dialogue with J.S.'s treatment team, and repeatedly explained its benefit determinations in detail.

As discussed above, Dr. Jones – a UBH Associate Medical Director and psychiatry specialist – spoke with the Avalon treatment team and was told that "'[J.S.] has made 'quite a bit of progress'"; her prescription dosage remained stable for a month; she "is purging less"; "her [eating disorder] symptoms are significantly less"; her laboratory test results on November 17, 2017 "were grossly [within normal limits]"; and she successfully spent an evening with her mother in early November 2017. (Id., Ex. 1 (Dkt. No. 34-1) at 19) (sealed)  J.S. also "maintain[ed] a healthy weight" and was "medically stable." (Id.) (sealed)

In a November 22, 2017 letter, UBH informed Sieden that it was denying benefits for J.S.'s "admission to Avalon," having determined that J.S. "could safely and effectively continue care in the Mental Health Outpatient [o]r Intensive Outpatient setting." (Def. R. 56.1 Stmt. (Administrative Record) at AR 2844) (sealed)  Dr. Jones explained that

> After talking with your doctor's designees, it seems that your child has made progress and that her condition does not meet guidelines for coverage of treatment in this setting.  She is medically stable.  She is not requiring any medication changes or adjustments.  She is maintaining a healthy weight.  She is thinking clearly and is able to participate in her care.  Her eating disorder symptoms have improved.  She has your support.  She does not seem to need 24 hour monitoring, support or care.

(Id.)

Moreover, and as noted above, as of November 2017, J.S. had resided at Avalon for fourteen months.  Throughout J.S.'s tenure at Avalon, UBH reviewers had expressed concern that Avalon had no real plan to address J.S.'s issues.  For example, as early as January 2017, Dema noted that there was "no real [estimated length of stay] or changes to [her treatment] plan." (Id., Ex. 8 (Dkt. No. 36-2) at 17) (January 20, 2017 medical records) (sealed)  Dema also noted that J.S. had been in a "positive reinforcement behavioral plan for roughly [two] months," and while there was some progress in December 2016, the plan "no longer seems to be motivating [J.S.]" – yet Avalon did not report any "changes to this plan." (Id. at 19) (sealed)  In

early 2017, Dr. Becker and Dr. Fischer likewise questioned Avalon's "treatment planning" for

J.S., noting that Avalon had failed to consider "reasonably intensive family involvement,"

despite "the evidence . . . for family work in the context of [J.S.'s] eating disorder."  (Id. at 30)

(Dr. Fischer February 2017 notes); see Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 34-1) at 12) (Dr.

Becker January 2017 notes) (sealed)  And in November 2017 – more than a year after J.S. was

admitted – Touchette expressed the same concern that Avalon still "does not have [a] detailed

treatment plan" as to "how they are going to address" J.S.'s recent decision to self-harm and her

declining compliance with Avalon's program.  (Def. R. 56.1 Stmt. (Dkt. No. 36) (Administrative

Record) at AR 397, 402) (sealed)

Given these circumstances, there was not "a reasonable expectation that [the

requested] services will improve the member's presenting problems within a reasonable period

of time."  (Def. R. 56.1 Stmt., Ex. 5 (Dkt. No. 33-6) at 2 (Guidelines); Pltf. R. 56.1 Stmt., Ex. 1

(Dkt. No. 34-1) at 19) (in denying benefits for residential care in November 2017, Dr. Jones

considered "[Touchette's] concerns that . . . [Avalon] does not have detailed treatment plan";

noting that "[J.S.] has been in intensive treatment at the [residential-treatment level] for the past

14 months," and that even though "[h]er mood is anxious and depressed," there "have been no

medication changes in more than a month") (sealed)

The Court concludes that UBH's decision to deny benefits for residential-level

care as of November 15, 2017 had a rational basis and was supported by substantial evidence.

### 2.    Whether UBH's Level of Care Guidelines Violate Plan Provisions

In arguing that UBH's denial of benefits was arbitrary and capricious, Plaintiff

contends that UBH's Level of Care Guidelines are inconsistent with "prevailing medical

standards."  (Pltf. Br. (Dkt. No. 30) at 23-25)  In the alternative, Plaintiff argues that UBH did

not correctly apply its own Guidelines, and that its benefit determinations "are not supported by the record." (Id. at 25-30)

        As discussed above, the Plan provides benefits for "health services" that United Healthcare and its affiliates – including UBH – "determine[] to be . . . consistent with . . . prevailing medical standards and clinical guidelines." (Pltf. R. 56.1 Stmt., Ex. 12 (Dkt. No. 34-12) at 83) (sealed)  The Plan authorizes UBH to "maintain[] clinical protocols that describe the scientific evidence, prevailing medical standards and clinical guidelines supporting its determinations regarding specific services." (Id.) (sealed)  This language authorizes UBH to create clinical guidelines that elaborate on the Plan's terms, while remaining consistent with the Plan's requirements.

        It is likewise undisputed that UBH relied on its Level of Care Guidelines in making the benefit determinations at issue.  Indeed, in its denial letters, UBH advises Sieden that its decisions are "based on" UBH's "Level of Care Guidelines" for residential and partial hospitalization level of care.  (See Def. R. 56.1 Stmt., Ex. 9 (Dkt. No. 36-3) at 3 (December 13, 2016 letter denying residential-level care); Pltf. R. 56.1 Stmt., Ex. 11 (Dkt. No. 34-11) at 89-90 (February 24, 2017 letter denying partial hospitalization-level care; Def. R. 56.1 Stmt. (Administrative Record) at AR 2844 (November 22, 2017 letter denying residential-level care) (sealed)

        Plaintiff argues that – in denying benefits for J.S.'s care – UBH exceeded its authority under the Plan, because its Level of Care Guidelines are inconsistent with the Plan's requirement that benefit determinations be made on the basis of "prevailing medical standards." (Pltf. Opp. (Dkt. No. 37) at 12)  The Plan's definition of "prevailing medical standards" is

premised on "nationally recognized professional standards of care," including "nationally recognized clinical guidelines." (Pltf. R. 56.1 Stmt., Ex. 12 (Dkt. No. 34-12) at 83)

UBH's Level of Care Guidelines state that they are "derived from generally accepted standards of behavioral health practice" for determining the appropriate level of care, including "guidelines and consensus statements produced by professional specialty societies," "guidance from governmental sources," and "input provided by clinical personnel, providers, professional specialty societies, consumers, and regulators." (See Def. R. 56.1 Stmt., Ex. 5 (Dkt. No. 33-6) at 5)

According to Plaintiff, however, UBH's Level of Care Guidelines are "more restrictive than prevailing medical standards," and by applying these Guidelines, UBH "impose[s] 'a standard not required by the plan's provisions[,]' and 'its actions may well be found to be arbitrary and capricious.'" (Pltf. Opp. (Dkt. No. 37) at 12) (quoting McCauley, 551 F.3d at 133)

In arguing that UBH's Level of Care Guidelines are not consistent with "generally accepted standards of medical practice" (see Pltf. Br. (Dkt. No. 30) at 21-23; Pltf. R. 56.1 Resp. (Dkt. No. 39) ¶ 5), Plaintiff relies on Wit v. United Behav. Health, No. 14 Civ. 2346 (JCS), 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019), a decision that was reversed by the Ninth Circuit. See Wit v. United Behav. Health, 79 F.4th 1068 (9th Cir. 2023).[9]

Wit is a class action brought by beneficiaries of ERISA welfare benefit plans, for which UBH was the claims administrator. Wit, 2019 WL 1033730, at *1, *4. Plaintiffs had

---

[9] The Court discusses Wit at some length, because the Wit district court decision is the primary support for Plaintiff's argument that UBH's Level of Care Guidelines violate the Plan. (See Pltf. Opp. (Dkt. No. 37) at 13) (citing Wit, 2019 WL 1033730, at *55, and other cases that are premised on the Wit district court decision)

made claims for mental health benefits, which UBH denied based on its 2013-15 Level of Care Guidelines.[10] Id. at *1-4. Each of the ERISA plans at issue required, "as one condition of coverage," that "the requested treatment . . . be consistent with generally accepted standards of care." Id. at *1, *13. As here, the plans at issue granted discretion to UBH to create tools, such as the Level of Care Guidelines, to assist in interpreting and administering the plans. Id. at *13 (finding that the Level of Care Guidelines "are an exercise of the discretion the Plans delegated to [UBH] as the claims administrator").

After a bench trial, the district court entered judgment in Plaintiffs' favor, finding that the UBH Level of Care Guidelines deviated from "generally accepted standards of care," and that – by relying on the Guidelines – UBH had improperly denied benefit claims. Id. at *22-39.

In so holding, the district court found that the Level of Care Guidelines are more restrictive than "generally accepted standards of care." For example, "treatment" under the Guidelines is overly "focuse[d] on the immediate, acute symptoms that brought the member to treatment," rather than on "long-term, chronic conditions," id. at *24; "[i]mprovement" is likewise equated with a "reduction or control of the acute symptoms that necessitated treatment in a level of care," id. at *24, *31; and members are moved to lower levels of care when their "acute symptoms have been addressed" and the "acute crisis has passed." Id. at *27, *30. According to the district court, the Guidelines' focus on acute symptoms "deviates" from "effective treatment of mental health" disorders, which instead aims to "prevent[] relapse or deterioration of the patient's condition" and "maintain[] the patient's level of functioning." Id. at

---

[10] The 2013-15 UBH Level of Care Guidelines are substantially similar to the 2016 UBH Level of Care Guidelines at issue here.

\*31.  The district court also concluded that the Level of Care Guidelines fail to "instruct

decision-makers to apply different standards when making coverage decisions involving children

and adolescents," including "relaxing the criteria for admission and continued stay to take into

account . . . the slower pace at which . . . adolescents generally respond to treatment."  Id. at \*34.

UBH appealed, and the Ninth Circuit reversed, finding that the ERISA plans at

issue do not "require the Guidelines to be coextensive" with generally accepted standards of

care:

> UBH's interpretation that the Plans do not require coverage for all care consistent
> with [generally accepted standards of care] does not conflict with the plain
> language of the Plans.  To the contrary, it gives effect to all the Plan provisions
> because the Plans exclude coverage for treatment inconsistent with [generally
> accepted standards of care] or otherwise condition treatment on consistency with
> [generally accepted standards of care].  In short, while the Plans mandated that a
> treatment be consistent with [generally accepted standards of care], they did not
> compel UBH to cover all treatment that was consistent with [generally accepted
> standards of care].

Wit, 79 F.4th at 1088-89 (emphasis in original).

In sum, the district court's decision in Wit was reversed on the precise point for

which Plaintiff cites the case:  whether the UBH Level of Care Guidelines violate plan

provisions mandating that a treatment be consistent with generally accepted standards of care.  In

reversing, the Ninth Circuit holds that the Level of Care Guidelines do not violate these plan

provisions, because while the plans require that a treatment be consistent with generally accepted

standards of care, they do not mandate that UBH authorize benefits for all treatment consistent

with generally accepted standards of care.  See id.

Here, it is undisputed that the Plan grants UBH the discretion to adopt guidelines

regarding benefit determinations, as long as those guidelines are "consistent with . . . prevailing

medical standards."  (Pltf. R. 56.1 Stmt., Ex. 12 (Dkt. No. 34-12) at 83) (Guidelines)  The

ERISA plans at issue in Wit stated that "the requested treatment must be consistent with

generally accepted standards of care, <u>Wit</u>, 2019 WL 1033730, at *13.  Similarly here, the Plan

covers "health services" that UBH "determines to be . . . [c]onsistent with . . . prevailing medical

standards and clinical guidelines."  (<u>See</u> Pltf. R. 56.1 Stmt., Ex. 12 (Dkt. No. 34-12) at 83)

(sealed)  The Plan here – like the plans at issue in <u>Wit</u> – requires that requested health services be

"consistent with" prevailing medical standards and clinical guidelines, but does not mandate that

UBH authorize benefits for every treatment that is consistent with prevailing medical standards

and clinical guidelines.  Instead – as in <u>Wit</u> – UBH is free to develop guidelines that provide a

narrower scope of coverage that falls within "prevailing medical standards."

      This Court concludes that UBH's Level of Care Guidelines do not violate the

Plan, and that UBH's use of the Guidelines in making benefit determinations falls within the

discretion it is granted in the Plan.[11]

---

[11]  Citing the <u>Wit</u> trial judge's determination that Dr. Allchin was "'only partially credible'" in
testifying that the Level of Care Guidelines represent "best practices" (Pltf. Opp. (Dkt. No. 37) at
18) (quoting <u>Wit</u>, 2019 WL 1033730, at *9), Plaintiff also argues that UBH relies on reviewing
physicians who are biased and not credible.  But nothing in the <u>Wit</u> trial judge's comments
concerning Dr. Allchin cast doubt on his clinical findings about particular patients.  Moreover, as
discussed above, Dr. Allchin's views regarding J.S.'s condition were corroborated by the case
notes and the views of other medical professionals.  (Def. R. 56.1 Stmt., Ex. 9 (Dkt. No. 36-3) at
3) (Dr. Becker); <u>id.</u>, Ex. 8 (Dkt. No. 36-2) at 29-30 (Dr. Fischer))

## CONCLUSION

For the reasons stated above, Defendant Rabobank's motion for summary judgment is granted, and Plaintiff Savage's cross-motion for summary judgment is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 26, 29), and to close this case.

Dated: New York, New York
       September 30, 2024

                                        SO ORDERED.

                                        _Paul S. Gardephe_
                                        _____
                                        Paul G. Gardephe
                                        United States District Judge